# EXHIBIT "Y"

# KELLER GROVER LLP

1965 MARKET STREET
SAN FRANCISCO, CALIFORNIA 94103
TELEPHONE: (415) 543-1305
FAX: (415) 543-7861

*Eric A. Grover, Esq.*
*eagrover@kellergrover.com*

April 5, 2013

**VIA E-MAIL & FIRST-CLASS MAIL**

Edward Totino, Esq.
Monica N. Dournaee, Esq.
DLA PIPER LLP
North Tower, Suite 400
2000 Avenue of the Stars
Los Angeles, California 90067

> Re:   *McCabe et al. v. Intercontinental Hotels Group Resources, Inc.; Intercontinental Hotels of San Francisco, Inc.; and Six Continents Hotels, Inc., et al.*

Dear Counsel:

This will follow up our correspondence earlier this week regarding your request for the **unredacted** telephone records of Brenda Simpson and Xavier Law, telephone numbers (916) 583-2163 and (916) 370-6959, respectively. As will be discussed in more detail below, unless adequate justification for the irrelevant records is provided, no such private and personal records will be produced.

Under the Erie doctrine, federal courts sitting in diversity jurisdiction apply federal procedural law and state substantive law. See *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). Federal courts are bound by the decisions of the state's highest court. *Harvey's Wagon Wheel, Inc. v. Van Blitter*, 959 F.2d 153, 154 (9th Cir. 1992). Where the California Supreme Court has not spoken on an issue of California law, the court may look to the holdings of the California Courts of Appeal. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 993 (9th Cir. 2001). Thus, here, California law regarding telephone records controls.

Code of Civil Procedure section 1985.3 specifically identifies an individual's telephone records as personal records entitled to protections accorded private information. *C.C.P.* § 1985.3(a)(1), (f). To obtain such records, a party must show a "particularized need for the confidential information sought. The broad 'relevancy to the subject matter' standard is not enough here. The court must be convinced that the information is directly relevant to a cause of action or defense, and must balance third party's privacy rights against the moving party's need for the

Exhibit Y

Edward Totino, Esq.
Monica N. Dournaee, Esq.
April 5, 2013
Page 2

discovery.  *See Britt v. Superior Court* (1978) 20 Cal.3d 844, 859-862; *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 657-658.  The more sensitive the information, the greater the need for discovery must be shown.  *Hoffman Corp. v. Superior Court* (1985) 172 Cal.App.3d 357, 362.

Moreover, this privacy right and protection against disclosure of telephone records is reiterated and reflected in numerous federal statutes.  For example, the Communications Act of 1934 and subsequent amendment by the Telecommunications Act of 1996 subjects every telephone carrier to strong obligations to guard the confidentiality of customer proprietary network information (CPNI), which includes customer calling activities and history.  Disclosure is not permitted without express customer approval.  A person's right to privacy in his or her telephone records was further recognized with the enactment of the Telephone Records and Privacy Protection Act of 2006, codified in 18 U.S.C. section 1039, which makes it a criminal offense to obtain "confidential phone records information" by making false statements or representations and without customer approval.  The Telephone Records and Privacy Protection Act recognized that a person's telephone records contain a "wealth of personal data," and that call logs may "reveal the names of telephone users' doctors, public and private relationships, business associations, and more."  The Act further stated that unauthorized disclosure of telephone records "assaults individual privacy."

Given this clear right to privacy over one's telephone records and the information contained within, as well as the broad protection afforded to such records, Defendants' request for unredacted records, without limitation, is unreasonable and an invasion of Brenda Simpson's and Plaintiff's son's right to privacy.  Only the telephone calls to Holiday Inn and possibly other hotels are relevant to the present action.

Moreover, while we have recently obtained telephone records from Metro PCS for the telephone numbers (916) 583-2163 and (916) 370-6959, the records provided in response to our subpoenas covered only the time period between July 25, 2012 and January 29, 2013.  As explained in the attached cover letters received from Metro PCS, the company retains call data for only six months, "after which they are overwritten and cannot be recovered."  Thus, the records that our office was provided from Metro PCS cover only the time period from end of July 2012 through end of January 2013 when the subpoenas were issued.  Plaintiff Simpson is not claiming that any phone calls during that timeframe are the basis for any liability in this action, and thus those records are completely irrelevant.

Based on the irrelevancy of the records received from Metro PCS, it would be a needless waste of time, money, and effort to produce completely redacted telephone records to Defendants.  Therefore, unless a compelling need can be demonstrated by Defendants, those telephone records will not be produced.

Edward Totino, Esq.
Monica N. Dournaee, Esq.
April 5, 2013
Page 3


    Please feel free to contact me if you wish to discuss matters further.  We hope that the
Court's involvement will be unnecessary.

Very truly yours,

Eric A. Grover

EAG/sa

Enclosures



## CERTIFICATION FOR METROPCS RECORDS

Angie Torrey
Security Compliance
2250 Lakeside Blvd.
Richardson, Texas 75082
1.800.571.1265

**Re: CORE#:** 546360

**Target Number: 916-583-2163**

I, Angie Torrey, hereby declare:

1. The declarant is a records custodian or other qualified person who can provide a written declaration regarding the records of regularly conducted business activity which are the subject of the certification.
2. The records of regularly conducted business activity (hereinafter "records") which are the subject of this certification are identified above.
3. The records are originals or duplicate copies of domestic (United States) business records.
4. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
5. The records were kept in the course of regularly conducted business activity; and
6. The records were made by the regularly conducted business activity as a regular practice.

**Subscriber Records**
The subscriber records were prepared by MetroPCS personnel in the ordinary course of business at or near the time of the act, condition, or event. Account information is entered into the MetroPCS Billing System where the data is stored. The Custodian of Records retrieves the stored data from the MetroPCS Billing System via billing software for compliance purposes.

**Call Detail Records**
The Call detail is recorded at the MetroPCS switch, to which the handset is assigned, at or near the time of the event. MetroPCS makes it a regular business practice to have the records stored for the purpose of assisting agencies with lawful subpoena requests for call detail records. **The call detail files are maintained for approximately 6 months depending on size and quantity, after which they are overwritten and cannot be recovered.**

**Text Messages**
Text messages are stored in a server located in Texas, Central Standard Time. MetroPCS makes it a regular business practice to have the records stored for the purpose of complying with lawful requests for text messages. **The files are maintained for approximately 60 days depending on size and quantity, after which they are overwritten and cannot be recovered.**

| | |
|---|---|
| *Signature of Declarant* | ___Angie Torrey_____<br>*Printed Name* |
| Custodian of Record____MetroPCS | ___2/13/2013_____ |
| *Title*        *Company Name* | *Date of Declaration* |



## CERTIFICATION FOR METROPCS RECORDS

Angie Torrey
Security Compliance
2250 Lakeside Blvd.
Richardson, Texas 75082
1.800.571.1265

**Re: CORE#:** 546358

**Target Number: 916-370-6959**

I, Angie Torrey, hereby declare:

1. The declarant is a records custodian or other qualified person who can provide a written declaration regarding the records of regularly conducted business activity which are the subject of the certification.
2. The records of regularly conducted business activity (hereinafter "records") which are the subject of this certification are identified above.
3. The records are originals or duplicate copies of domestic (United States) business records.
4. The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
5. The records were kept in the course of regularly conducted business activity; and
6. The records were made by the regularly conducted business activity as a regular practice.

**Subscriber Records**
The subscriber records were prepared by MetroPCS personnel in the ordinary course of business at or near the time of the act, condition, or event. Account information is entered into the MetroPCS Billing System where the data is stored. The Custodian of Records retrieves the stored data from the MetroPCS Billing System via billing software for compliance purposes.

**Call Detail Records**
The Call detail is recorded at the MetroPCS switch, to which the handset is assigned, at or near the time of the event. MetroPCS makes it a regular business practice to have the records stored for the purpose of assisting agencies with lawful subpoena requests for call detail records. **The call detail files are maintained for approximately 6 months depending on size and quantity, after which they are overwritten and cannot be recovered.**

**Text Messages**
Text messages are stored in a server located in Texas, Central Standard Time. MetroPCS makes it a regular business practice to have the records stored for the purpose of complying with lawful requests for text messages. **The files are maintained for approximately 60 days depending on size and quantity, after which they are overwritten and cannot be recovered.**


_Signature of Declarant_          ___Angie Torrey_____
                                     _Printed Name_

Custodian of Record     MetroPCS         ___2/13/2013_____
_Title_            _Company Name_          _Date of Declaration_

# EXHIBIT "Z"

# KELLER GROVER LLP

1965 MARKET STREET
SAN FRANCISCO, CALIFORNIA 94103
TELEPHONE: (415) 543-1305
FAX: (415) 543-7861

April 17, 2014

*VIA OVERNIGHT DELIVERY*

The Honorable Tani G.Cantil-Sakauye, Chief Justice,
and Associate Justices
Supreme Court of California
350 McAllister Street
San Francisco, California 94102

Re:     **Request for Depublication (Cal. Rules of Court, Rule 8.1125(a))**
        *Hataishi, et al.  v. First American Home Buyers Protection Corporation, et al.*
        B244769, Second Appellate District, Division Three
        Los Angeles County Superior Court Case No. BC420436

Dear Honorable Justices:

This letter is submitted by Keller Grover LLP and Law Offices of Scot D. Bernstein, A Professional Corporation (Bernstein Law Offices) as *amicus curiae* respectfully requesting depublication, in whole or in part, of the recent opinion in *Hataishi et al. v. First American Home Buyers Protection Corporation., et al.* ("*Hataishi*") (copy attached). The *Hataishi* opinion was filed on February 21, 2014 (Court of Appeal Case No. B244769). This depublication request is timely filed within 30 days after the opinion became final on March 23, 2014.[1]

## I.      Keller Grover LLP's and Bernstein Law Offices' Interest

Keller Grover LLP is a California law firm dedicated to protecting the rights of employees, consumers, and individuals involved in disputes that relate to issues pertaining to employment law, consumer protection, and antitrust matters. Keller Grover also has represented plaintiffs in numerous privacy and data breach class action matters, including privacy violations similar to those alleged in *Hataishi*. Currently, Keller Grover has at least six active cases pending before various state and federal courts in California involving violations of California's Invasion of Privacy Act, Penal Code §§ 630 *et eq.*, including: *Young v. Hilton Worldwide, Inc. et al.* ("*Young*"), Ninth Circuit Court of Appeal No. 12-56189 (USDC Central District of California Case No. 2:12-cv-01788-R-PJW); *McCabe et al. v. Six Continents Hotels, Inc. et al.* ("*McCabe*"), USDC Northern District of California Case No. 3:12-cv-04818-NC; *Nguyen v. Shell Oil Company et al.* ("*Nguyen*"), USDC Northern District of California Case No. 4:12-cv-04650-YGR; *Roberts v. Wyndham Hotels and*

---

1 Cal. Rules of Court, Rule 8.1125(a)(4).

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 2

*Resorts, LLC et al.* ("*Roberts*"), USDC Northern District of California Case No. 5:12-cv-05083-PSG; *Wheelock v Hyundai Motor America* ("*Hyundai*"), Orange County Superior Court Case No. 30-2011-00522293-CU-BT-CJC; and *Simpson v. Vagabond Franchise System, Inc.*("*Simpson*"), Los Angeles County Superior Court Case No. BC524201.

Bernstein Law Offices currently has four active cases pending before various state and federal courts in California involving violations of California's Invasion of Privacy Act, including the *McCabe, Nguyen, Roberts* and *Simpson* matters listed above.

Collectively, these cases involve alleged privacy violations directly affecting tens of thousands of Californians and their rights under decades-old statutes to compensation for those violations.

**II.   Reasons for Depublication**

The *Hataishi* case is part of a recent, disturbing trend of lower and intermediate courts chipping away at the constitutionally protected right to privacy shared by all citizens of California – a right that appears multiple times in Article I of our Constitution, including its listing in Article I, Section 1 as a fundamental right of all Californians.  Although First American admitted that it had no warning or disclosure in place regarding its practice of recording its outbound telephone calls, the trial court denied class certification based on lack of ascertainability and absence of commonality and superiority.  The issue on appeal in *Hataishi* was whether the trial court's denial of class certification was supported by substantial evidence. The Court of Appeal affirmed, concluding that substantial evidence supported the trial court's conclusions that, given the particular facts and circumstances alleged, (1) individualized proof would be required to assess the objective reasonableness of an individual's expectation of confidentiality and (2) individualized call-by-call inquiry would be required to determine what type of telephone was used to receive the subject call. The Court of Appeal held that the trial court did not commit legal error in concluding that common questions of fact did not predominate, and did not consider any other grounds on which the trial court relied in denying certification.

As a whole, the *Hataishi* opinion does not meet the requirements for publication. Moreover, in dicta, the Court of Appeal improperly considered and opined upon Penal Code § 632.7, a cause of action that was not at issue before either the trial court or the Court of Appeal.  Therefore, for the reasons discussed in more detail below, the *Hataishi* opinion should be depublished in its entirety, or at a minimum, should be depublished in part with respect to the portion of the opinion that discusses § 632.7.[2]

**A.   Rule of Court 8.1105(c) Supports Depublication**

Rule of Court 8.1105(c) provides specific situations that support certifying an opinion for publication, such as when the opinion:

---

2 Cal. Rules of Court, Rule 8.1110.

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 3

(1) Establishes a new rule of law;

(2) Applies an existing rule of law to a set of facts significantly different from those stated in published opinions;

(3) Modifies, explains, or criticizes with reasons given, an existing rule of law;

(4) Advances a new interpretation, clarification, criticism, or construction of a provision of a constitution, statute, ordinance, or court rule;

(5) Addresses or creates an apparent conflict in the law;

(6) Involves a legal issue of continuing public interest;

(7) Makes a significant contribution to legal literature by reviewing either the development of a common law rule or the legislative or judicial history of a provision of a constitution, statute, or other written law;

(8) Invokes a previously overlooked rule of law, or reaffirms a principle of law not applied in a recently reported decision; or

(9) Is accompanied by a separate opinion concurring or dissenting on a legal issue, and publication of the majority and separate opinions would make a significant contribution to the development of the law.

None of the factors supporting certification for publication is present in *Hataishi*. The *Hataishi* opinion is less than 16 pages of text, with more than half the pages containing a recitation of the underlying facts and a brief summary of existing case law regarding class certification standards. After this general overview, the opinion continues with a cursory discussion of Penal Code § 632 and the existing cases interpreting that section, mainly *Kight v. Cashcall*.[3] Applying the facts in *Hataishi* to existing case law, the Court of Appeal merely agreed with its own reasoning in *Cashcall* and affirmed that the determination whether an individual plaintiff had an objectively reasonable belief that his or her conversation was confidential and would not be recorded without consent would require individualized proof[4].

Accordingly, the *Hataishi* opinion does not modify or criticize existing case law, nor does it advance a new interpretation of the statute or related cases. Further, no separate concurring or dissenting opinion was issued, and no significant contribution to the development of the law was made by the Court of Appeal's application of the facts to existing case law. Therefore, the *Hataishi* opinion does not meet any of the standards required for publication.

**B.    Penal Code § 632.7 Never Was At Issue in *Hataishi*
        And Should Not Have Been Addressed on an Undeveloped Record**

Section Four of the Court's Discussion addresses a claim that *could* have been alleged by Hataishi *but never was*: a claim for violation of Penal Code § 632.7. Thus, that section of the opinion is entirely dicta that is wholly unnecessary to the opinion or its result and should be depublished even if any other portion of the opinion is allowed to stand.

---

[3] *Kight v. Cashcall, Inc.*, 200 Cal.App.4th 1377 (2011).

[4] Note that an expectation of privacy is irrelevant to claims under Penal Code § 632.7, a section that was not before either the trial court or the Court of Appeal.

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 4

First, Penal Code § 632.7 never was at issue in *Hataishi*. This separate and distinct cause of action never was alleged in the original or First or Second Amended Complaints. The issue was raised for the first time in Plaintiff's motion for class certification, in which Plaintiff sought alternative relief and requested leave to amend if the trial court found that the claim under § 632 did not encompass cellular phones. No motion to amend to include a claim under § 632.7 was made before the trial court's ruling on certification, and thus that section never was substantively considered by the trial court.

When reviewing an order denying class certification, appellate courts should "consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial."[5] In its discussion of the trial court proceedings and in its subsequent dicta, the Court of Appeal correctly noted that Hataishi failed to file a formal motion to amend or to make the evidentiary showing required by Rule 3.1324 of the California Rules of Court. Thus, the Court of Appeal found no abuse of discretion in the trial court requiring Plaintiff to bring a motion to amend to which First American would have an opportunity to respond. In so holding, the Court explicitly recognized that § 632.7 had not been considered by the trial court and thus was not a ground for denial. This finding of an absence of abuse of discretion should have ended the Court of Appeal's discussion regarding § 632.7, as no further evidence or record had been developed since this claim never was at issue or before the trial court at all.

Notwithstanding a complete lack of any factual evidence or a developed record of any sort, and without critical analysis of public policy considerations, the Court of Appeal then went on to offer, in dicta, the wholly unsubstantiated opinion that adding a § 632.7 claim would not have dispensed with the need to engage in an individual factual inquiry to determine what type of telephone was used to receive the defendant's call. Based on evidence and expert opinion adduced in our pending cases, it is clear that statement is over-broad and misleading. It also is incorrect, in that various types of telephone-related records can identify cellular telephones without any need for individual inquiries directed to class members. Unfortunately, this unnecessary section of the opinion already has been seized upon by defendants in pending cases to argue that class certification is impossible in § 632.7 cases, which by the plain wording of that section does not contain the requirement of confidentiality found in Penal Code § 632. The opinion's sweeping statement, unsupported by any evidence or record below and contrary to the plain words of § 632.7, is manifestly unfair to parties with ongoing cases who are deprived of the opportunity to develop their own record.

Given the lack of any factual record – or even a Penal Code § 632.7 cause of action in the underlying case – Section Four of the Discussion section of the opinion should be depublished even if other parts of the opinion are allowed to remain published.

**C.    California Has a Strong, Longstanding and Continuing Interest in Protecting The Privacy Rights of Its Citizens**

---

5 *Jaimez v. DAIOHS USA, Inc.*, 181 Cal.App.4th 1286, 1297-1298 (2010).

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 5

California's Constitution enshrines privacy as a protected, inalienable right: "All people are by nature free and independent and have *inalienable rights*. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*."[6] As explained recently by this Court, this explicit constitutional provision "was enacted in part specifically to protect Californians from overly intrusive business practices that were seen to pose a significant and increasing threat to personal privacy."[7] The California Invasion of Privacy Act ("CIPA"), codified in California Penal Code §§ 630, *et seq.*, enhances and specifically protects this inalienable right to privacy by establishing protections against unlawful intrusions into private communications.[8]

As noted by the enacting Legislature and well-recognized by California courts, CIPA is a "broad, protective, invasion-of-privacy statute" enacted to address "a serious and increasing threat to the confidentiality of communications resulting from then recent advances in science and technology that had led to the development of new devices and techniques for eavesdropping upon and recording such private communications.[9] Under the construction adopted by this Court, "the Privacy Act is a coherent statutory scheme. It protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved."[10]

CIPA plays a crucial role in protecting the privacy rights of California residents. In fact, this Court recently recognized and stated that "California must be viewed as having a *strong and continuing interest in the full and vigorous application* of the provisions of section 632 prohibiting the recording of telephone conversations without the knowledge or consent of *all* parties to the conversation."[11] Given this strong public policy to protect its citizens' right to privacy, California's courts should be cautious about publishing opinions, like *Hataishi*, which unnecessarily intrude into or erode that right to privacy.

**D.   Public Policy Favors Class Actions as an Important for Law Enforcement Tool**

Class actions are an important component of our legal system. California law has long highlighted the importance and benefits of the class action device.[12] Over the past 25 years, this Court consistently has removed barriers to using class action procedures.[13] In *Richmond v. Dart Industries, Inc.*, this Court aptly recognized that:

---

6 Cal. Const. art. 1, § 1 (emphasis added).
7 *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 125 (2006).
8 See Cal. Penal Code § 630.
9 *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95 at 115.
10 *Flanagan v. Flanagan*, 27 Cal.4th 766, 771 (2002).
11 *Kearney*, 39 Cal.4th at 126 (emphasis added).
12 See, e.g., *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340.
13 *See, e.g., State of California v. Levi Strauss & Co.*, 41 Cal.3d 460 (1986); *Richmond v. Dart Industries, Inc.*, 29 Cal.3d 462 (1981); *La Sala v. American Sav. & Loan Assn.*, 5 Cal.3d 864 (1971); *Vasquez v. Superior Court*, 4 Cal.3d 800 (1971); *Daar v. Yellow Cab Co.*, 67 Cal.2d 695 (1967); *Occidental Land, Inc. v. Superior Court*, 18 Cal.3d 355 (1976).

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 6

Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.[14]

In noting the substantial benefits to both the parties and the courts, and in urging the utility of the class suit to vindicate consumer rights, this Court commented that:

Modern society seems increasingly to expose men to group injuries for which individually they are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive. If each is left to assert his rights alone if and when he can, there will at best be a random and fragmentary enforcement, if there is any at all. This result is not only unfortunate in the particular case, but it will operate seriously to impair the deterrent effect of the sanctions which underlie much contemporary law.[15]

Without any meaningful analysis of class certification requirements, the *Hataishi* opinion simply affirmed that the trial court had substantial evidence to find that common questions of fact did not predominate in the circumstances alleged. The opinion does not add to the governing case law as Rule 8.1105(c) requires for publication. More importantly, it contravenes well-established case law and public policy supporting class actions as an important enforcement tool.

This is especially detrimental in *Hataishi* and in other cases involving privacy violations, where putative class members whose telephone conversations were recorded and/or monitored without notice or consent would likely never know of the violation absent class action notification. The nature of the rights violated requires the class action vehicle to provide adequate redress as well as to discourage future wrongdoing.

Conversely, a sweeping statement appearing to make class actions unavailable as an enforcement tool in an environment in which the violations are likely never to be discovered by the victims sends the message that deliberate privacy violations can be committed with impunity. That is unfair to consumers whose statutorily- and constitutionally-protected privacy rights are secretly violated. It is unfair to the violators' law-abiding competitors. And it is unfair to a state that has long-since established rules and standards for a civilized existence and to a public that has a right to expect adherence to the rule of law.

Therefore, both justice for persons whose privacy rights were violated and the convenience of the courts dictate that these types of suits should be maintained as class actions. To the extent that the *Hataishi* opinion undermines the importance and utility of class actions in protecting and enforcing privacy rights, this is yet another reason to depublish the opinion.

---

14 *Richmond v. Dart Industries, Inc.*, 29 Cal.3d at 469.
15 *Vasquez v. Superior Court*, 4 Cal.3d at 808.

Presiding Chief Justice Cantil-Sakauye and Associate Justices
April 17, 2014
Page 7


**III.     CONCLUSION**

The *Hataishi* opinion does not meet the Rule 8.1105(c) standards for publication.  Further, its sweeping dicta can be read as taking away the primary mechanism for enforcing California's strong public policy of protecting the privacy of its citizens.  For the foregoing reasons, we respectfully request that the Court depublish the *Hataishi* opinion in its entirety or, at a minimum, depublish Section Four of the Discussion regarding § 632.7, which never was at issue in the case.


Respectfully submitted,

**KELLER GROVER LLP**


By _____
     Eric A. Grover


cc:     Service List on All Interested Parties and Counsel
        California Court of Appeal

Filed 2/21/14

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| DINA HATAISHI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FIRST AMERICAN HOME BUYERS<br>PROTECTION CORPORATION,<br><br>    Defendant and Respondent. | B244769<br><br>(Los Angeles County<br>Super. Ct. No. BC420436) |

APPEAL from an order of the Superior Court of Los Angeles County, Charles F. Palmer, Judge.  Affirmed.

Law Offices of Lisa L. Maki and Lisa L. Maki; Kiesel + Larson and Paul R. Kiesel for Plaintiff and Appellant.

Dentons US, Joel D. Siegel and Paul M Kakuske for Defendant and Respondent.

_____

## INTRODUCTION

Named plaintiff Dina Hataishi (Plaintiff) appeals from a trial court order denying her motion for certification of a California class of Defendant First American Home Buyers Protection Corporation's (First American) customers whose telephone conversations were recorded without warning. Plaintiff contends that First American's conduct violates Penal Code[1] section 632, which prohibits the intentional recording of a "confidential communication" without the consent of all parties to the communication. The trial court denied Plaintiff's motion for class certification for lack of ascertainability, community of interest and superiority. We affirm on the ground that the proposed class lacks the requisite community of interest and do not reach the court's other bases for denying class certification.

Our Supreme Court has held that "a conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 777 (*Flanagan*).) Here, the trial court ruled that determining whether an individual plaintiff had an objectively reasonable expectation that his or her telephone conversation would not be recorded is a question of fact subject to individualized proof. We conclude the trial court applied the correct legal standard and that its ruling is supported by substantial evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *First American's Call Recording System*

First American issues one-year home warranty plans to customers in 46 states, including California. The plans typically cover the major systems and appliances in a customer's home.

---

[1]    All future statutory references are to the Penal Code unless otherwise specified.

2

Customers may make warranty claims with First American by calling an "800" number printed on the warranty contract.  In addition, First American's Inside Sales group makes outbound calls to existing customers as part of various marketing campaigns or to solicit customers to renew their home warranty contracts.

All calls between First American and its customers—whether inbound calls by the customer or outbound calls by the Inside Sales group—are recorded by First American's Voice Print International, Inc. (VPI) system.  The VPI system is a "full-time" call recording system.  The recording equipment cannot be turned off by the Inside Sales group representatives who make outbound calls.

A customer placing an inbound call to First American is greeted with the following automated disclosure regarding call monitoring or recording:  "First American Home Buyer's Protection - your first choice in home warranty.  To ensure the highest quality service your call may be monitored or recorded."  The customer cannot bypass the disclosure.

The automated disclosure regarding call monitoring or recording is not played when a customer receives an outbound call from the Inside Sales group.  Prior to 2009, First American also did not have a policy requiring Inside Sales group representatives to advise customers that outbound calls would be recorded.[2]  Nor did First American's Sales, Policy, and Procedure Manual provide Inside Sales group representatives with directions for advising customers that calls would be recorded.

2.   *Plaintiff's Call History with First American*

In April 2005, Plaintiff purchased a one-year First American home warranty plan.  She renewed her plan annually for the next three years, until it expired on May 18, 2009.

Between April 20, 2005 and May 19, 2008 (the date Plaintiff received her first outbound call from an Inside Sales group representative), Plaintiff made approximately 12 inbound calls to First American to either renew her warranty plan, or to make, or

---

[2]   In October 2009, First American implemented a policy requiring its representatives to begin each outbound call with a customer by identifying themselves and informing the customer that the call will be recorded.

follow-up on, warranty claims she had made pursuant to the plan.  During each of those inbound calls, Plaintiff was advised by First American's automated disclosure that the "call may be monitored or recorded."  Plaintiff never told the First American representative that she refused to be recorded and she never terminated the call to avoid being recorded.

Apart from her interactions with First American, Plaintiff also confirmed that she had participated in "dozens and dozens and dozens" of telephone calls with companies where she understood her call could be recorded or monitored for quality assurance.  As with her calls to First American, Plaintiff did not object to being recorded during any of these calls.

On May 19, 2008, Plaintiff received an outbound call from First American's Inside Sales group.  On May 27, 2009, Plaintiff received another outbound call from the Inside Sales group.  Each call was recorded by First American's VPI system.  The recordings confirmed that Plaintiff did not receive a disclosure that the calls would be recorded.

3. *The Operative Second Amended Complaint*

Plaintiff's operative second amended complaint asserts a single cause of action for statutory invasion of privacy in violation of section 632 on behalf of Plaintiff and other current, former and prospective customers of First American whose telephone conversations were recorded without the customers' knowledge or consent.  The complaint seeks statutory penalties pursuant to section 637.2 of $5,000 per violation of section 632, injunctive relief, and attorney fees pursuant to Code of Civil Procedure section 1021.5.

4. *Plaintiff's Motion for Class Certification*

Plaintiff moved for certification of an opt-out class defined as follows:  "All persons within the state of California who received telephone calls from employees, agents or representatives of First American Home Buyers Protection Corporation's Inside Sales division and whose telephone conversation(s) were recorded without warning from July 13, 2006 to October 27, 2009."

4

With respect to the community of interest requirement, Plaintiff argued that common issues of law and fact predominated because: (1) First American was the only defendant; (2) First American's policy was to record all outbound calls by its Inside Sales group; (3) the outbound calls were not preceded by an automated warning that the call would be recorded; and (4) prior to 2009, First American did not direct its Inside Sales group to advise customers it was recording outbound calls. Plaintiff also maintained that the two outbound calls she received were typical of those received by other putative class members, and that she and her counsel would fairly and adequately protect the interests of the class.

### 5. First American's Opposition to Class Certification

In opposition to Plaintiff's class certification motion, First American principally argued that Plaintiff's section 632 claim presented numerous individual factual issues. Among other things, First American argued that specific factual findings were required to be made to determine whether an individual plaintiff reasonably believed that his or her call with the Inside Sales group would not be recorded. In that regard, First American contended that each putative class member's unique experiences—including the length of the class member's relationship with First American, the number of times the class member heard First American's automated disclosure regarding the recording of inbound calls, and the class member's experience with other businesses that monitor calls for quality assurance—would be relevant to assessing whether a particular class member reasonably believed an outbound call from First American would not be recorded.

In support of the contention, First American cited Plaintiff's unique circumstances and experience—e.g., the dozen or so inbound calls Plaintiff made to First American in which she was repeatedly advised the call "may be monitored or recorded." First American also presented the declaration of its marketing expert, Linda Golden, who conducted an internet survey of California homeowners to determine customer expectations regarding call monitoring and recording for quality assurance. The survey results showed that 61.6 percent of qualified participants would expect a call from a company to be monitored or recorded for quality assurance if they had received an

automated disclosure during a prior call to the company advising that the call may be monitored or recorded.

Additionally, because section 632 does not apply to a "radio" device, First American argued that Plaintiff's claim raised individualized questions concerning whether each outbound call was received via a landline, cellular or cordless telephone.

6.    *The Trial Court's Ruling*

The trial court ruled that Plaintiff failed to meet her burden to establish an ascertainable class, predominate common factual questions, and the superiority of a class action.

On commonality, the trial court found that an individual inquiry was required to determine whether each putative class member had an objectively reasonable expectation that his or her telephone conversation with First American would not be recorded. The court rejected Plaintiff's contention that the objective reasonableness of each plaintiff's expectation could be assessed by reference to First American's uniform call recording procedures. On the contrary, the court found the reasonableness of an individual plaintiff's expectation will vary depending on his or her past experiences with First American, including the number of calls the individual previously made to First American in which he or she was advised that the call would be monitored or recorded.

The trial court also found that a call-by-call inquiry would be required to determine whether a landline, cellular or cordless telephone had been used to receive a particular outbound call. Plaintiff conceded that the operative second amended complaint pled only a cause of action for violation of section 632, which does not apply to cellular or cordless telephones, but argued that this should not defeat commonality because the complaint could be amended to assert a claim under section 632.7, which prohibits recording or eavesdropping upon cellular or cordless telephone calls. Plaintiff, however, did not file a motion to amend, nor did she present a declaration addressing the factors

specified in rule 3.1324 of the California Rules of Court.[3]  The trial court expressed
concern that due process required Plaintiff to bring a motion, to which First American
would have an opportunity to respond, before the court could consider granting leave to
amend the complaint.  Plaintiff conceded the point and agreed to "make a formal motion"
asking "the court to amend the complaint to include a [section] 632.7 claim . . . ."

DISCUSSION

    1.    *Class Certification Principles*

        a.    *Standard of review*

"Code of Civil Procedure section 382 authorizes class actions 'when the question
is one of a common or general interest, of many persons, or when the parties are
numerous, and it is impracticable to bring them all before the court . . . .'  The party
seeking certification has the burden to establish the existence of both an ascertainable
class and a well-defined community of interest among class members.  [Citation.]"  (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).)  The party
also must demonstrate there are "substantial benefits from certification that render
proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior
Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

As " 'trial courts are ideally situated to evaluate the efficiencies and practicalities
of permitting group action, they are afforded great discretion in granting or denying
certification.' " (*Sav-On, supra,* 34 Cal.4th at p. 326.)  Thus, "in the absence of other
error, a trial court ruling supported by substantial evidence generally will not be disturbed
'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were
made [citation]' [citation].  Under this standard, an order based upon improper criteria or
incorrect assumptions calls for reversal ' "even though there may be substantial evidence

---

[3]    California Rules of Court, rule 3.1324, subdivision (b) requires a declaration to be
filed with a motion to amend the pleadings that specifies "(1) The effect of the
amendment; [¶] (2) Why the amendment is necessary and proper; [¶] (3) When the facts
giving rise to the amended allegations were discovered; and [¶] (4) The reasons why the
request for amendment was not made earlier."

to support the court's order." ' [Citations.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.) Accordingly, "on appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial." (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843-844.) "We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. [Citation.]" (*Ibid.*)

        b.    *Predominate common questions requirement*

      The " ' "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citation.]" (*Brinker, supra,* 53 Cal.4th at p. 1021.) The "[p]laintiffs [have the] burden to establish the requisite community of interest and that '. . . questions of law or fact common to the class predominate over the questions affecting the individual members.' [Citation.]" (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104.)

      "Common issues are predominant when they would be 'the principal issues in any individual action, both in terms of time to be expended in their proof and of their importance . . . .' [Citation.] A '. . . class action cannot be maintained where each member's right to recover depends on facts peculiar to his case . . . ' because ' . . . the community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover . . . . [Citation.]' [Citation.]" (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 667-668.) "Presented with a class certification motion, a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate." (*Brinker, supra,* 53 Cal.4th at p. 1025.) Proof of most of the important issues as to the named plaintiffs must supply the proof as to all members of the class. (See *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 815.)

Although on review we assume all causes of action have merit, " 'issues affecting the merits of a case may be enmeshed with class action requirements . . . .' [Citations.] When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them. [Citations.] The rule is that a court may 'consider[ ] how various claims and defenses relate and may affect the course of the litigation' even though such 'considerations . . . may overlap the case's merits.' [Citations.]" (*Brinker, supra,* 53 Cal.4th at pp. 1023-1024.) More specifically, "whether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." (*Id.* at p. 1024.)

"Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]" (*Brinker, supra,* 53 Cal.4th at p. 1022.)

With these rules in mind, we turn to Plaintiff's claim under section 632 and the trial court's ruling denying class certification.

2.   *A Communication Is "Confidential" Under Section 632 if a Party Has an Objectively Reasonable Expectation That the Conversation Is Not Being Overheard or Recorded*

Section 632, part of California's Invasion of Privacy Act (Privacy Act), prohibits the intentional recording of a "confidential communication" without the consent of all parties to the communication. Specifically, section 632, subdivision (a) imposes liability on "[e]very person who, intentionally and without the consent of all parties to a *confidential communication,* by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio . . . ." (Italics added.)

9

Section 632, subdivision (c) defines the term " 'confidential communication' " to "include[ ] any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but *excludes* a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in *any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.*" (Italics added.)

In *Flanagan, supra,* 27 Cal.4th 766, our Supreme Court granted review to resolve two conflicting lines of cases pertaining to the meaning of "confidential communication" under section 632. One line of authority known as the "Frio Test" held that "under section 632 'confidentiality' appears to require nothing more than the existence of a reasonable expectation by one of the parties that no one is 'listening in' or overhearing the conversation. " (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1490 (*Frio*).) Under this line of authority, a plaintiff proves a conversation is "confidential" by showing he or she has "an objectively reasonable expectation that the conversation is not being *overheard or recorded.*" (*Flanagan,* at p. 768, italics added.) The other line of authority known as the *O'Laskey* test held that "a conversation is confidential only if the party has an objectively reasonable expectation that the content will not *later be divulged to third parties.*" (*Flanagan,* at p. 768, citing *O'Laskey v. Sortino* (1990) 224 Cal.App.3d 241, italics added.)

After examining section 632's language and purpose, the *Flanagan* court endorsed the *Frio* test and disapproved of the *O'Laskey* line of cases. The Supreme Court reasoned that "[b]y focusing on 'simultaneous dissemination,' not 'secondhand repetition' [citation], the *Frio* definition of 'confidential communication' . . . better fulfills the legislative purpose of the Privacy Act by giving greater protection to privacy interests than does the *O'Laskey* standard." (*Flanagan, supra,* 27 Cal.4th at p. 775.) Thus, the Supreme Court concluded that "a conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." (*Id.* at pp. 776-777.)

10

In *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95 (*Kearney*), the Supreme Court revisited the showing necessary to establish that a communication is "confidential" under section 632. There, the trial court sustained a demurrer without leave to amend on the ground that the Georgia-based defendant could not be held liable under section 632 for recording telephone conversations with California residents because the conduct was permissible under Georgia law. The Court of Appeal affirmed, but the Supreme Court reversed, holding that section 632 applied to conversations in which only one party was in California.

Although *Kearney* was primarily a choice-of-law case, the Supreme Court's governmental interest analysis required it to assess the scope of section 632 and the interests protected by the statute. The court concluded that California had a "strong and continuing interest in the full and vigorous application of . . . section 632," but noted that the statute prohibits monitoring or recording only "without the knowledge or consent of all parties to the conversation" (*Kearney, supra*, 39 Cal.4th at p. 125, italics omitted) and only " 'if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded' " (*id.* at p. 117, fn. 7, quoting *Flanagan, supra*, 27 Cal.4th at p. 777). The Supreme Court nevertheless rejected the Court of Appeal's suggestion that, under California law, "even in the absence of an explicit advisement, clients or customers of financial brokers . . . 'know or have reason to know' that their telephone calls with the brokers are being recorded." (*Kearney*, at p. 118, fn. 10.) The court noted that no authority had been cited "establishing such a proposition as a matter of law, and in light of the circumstance that California consumers are accustomed to being informed at the outset of a telephone call whenever a business entity intends to record the call, it appears *equally plausible* that, in the absence of such an advisement, a California consumer reasonably would anticipate that such a telephone call is not being recorded . . . ." (*Ibid.*, italics added.) Underscoring the factual inquiry necessary to determine the reasonableness of the plaintiffs' privacy expectations, the court observed that "because this case is before us after the sustaining of a demurrer, we

cannot assume for purposes of this appeal that the telephone conversations here at issue were not 'confidential communications' within the meaning of section 632." (*Ibid.*)

With this overview, we turn to the trial court's ruling that individualized proof is required to determine whether a particular outbound telephone call was a "confidential communication" as defined by section 632.

> 3. *Individual Questions Predominate on the Threshold Question of Confidentiality Because the Objective Reasonableness of an Individual Plaintiff's Expectation Will Depend on the Plaintiff's Unique Circumstances*

In this case, the trial court found the requisite community of interest lacking because each putative class member, in order to establish that an outbound call was a "confidential communication" under section 632, would be required to individually prove the objective reasonableness of his or her alleged expectation that the call would not be recorded. The court based its ruling on the standard articulated in *Flanagan*, as applied by the Court of Appeal in *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*CashCall*), and evidence showing that First American's automated message for every inbound call advises customers that calls may be recorded. We conclude the trial court applied the correct legal standard and that its ruling was supported by substantial evidence.

In *CashCall*, the plaintiffs, on behalf of themselves and a class of California consumers, alleged the defendant consumer finance company monitored calls with its customers without their consent in violation of section 632. (*CashCall, supra*, 200 Cal.App.4th at p. 1383.) Except for certain limited circumstances, a customer making an inbound call to the defendant was greeted with an automated " ' "Call Monitoring Disclosure" ' " which stated: ' "This call may be monitored or recorded for quality control purposes." ' " (*Id.* at p. 1385.) However, the Call Monitoring Disclosure was never provided on outbound calls from the defendant's employees to its customers. Based on these undisputed facts, the defendant moved for summary judgment, asserting, among other things, that none of the calls with defendant's employees were "confidential

communications" within the meaning of section 632. (*Id.* at pp. 1386, 1396.) The trial court granted summary judgment, but the Court of Appeal reversed.

Applying the definition of "confidential communication" articulated by the Supreme Court in *Flanagan*, the *CashCall* court determined that defendant had failed to meet its "burden to present evidence showing plaintiffs (and the class members) had no reasonable expectation of privacy as a matter of law . . . ." (*CashCall, supra,* 200 Cal.App.4th at p. 1397.) In reaching this conclusion, the court made clear that it was not expressing an opinion as to whether plaintiffs would ultimately prevail on the issue at trial. (*Id.* at p. 1396.) On the contrary, the *CashCall* court observed that, consistent with *Flanagan* and *Kearney*, "[t]he issue whether there exists a reasonable expectation that no one is secretly listening to a phone conversation is generally a question of fact that may depend on *numerous specific factors*, such as whether the call was initiated by the consumer or whether a corporate employee telephoned a customer, the length of the customer-business relationship, the customer's prior experiences with business communications, and the nature and timing of any recorded disclosures." (*Ibid.*, italics added.) Given the "limited record," the court held "factual issues exist on the reasonable expectation issue and thus summary adjudication on plaintiffs' section 632 claim was not warranted." (*Ibid.*)

Plaintiff does not quarrel with the *CashCall* court's conclusion, or with the list of factors the court identified as relevant to the assessment of whether there exists an objectively reasonable expectation that no one is secretly listening to a telephone conversation. Instead, Plaintiff contends that *CashCall* is applicable to only the specific circumstances of eavesdropping, and argues that the factors it identified would not be relevant to the reasonableness of an expectation that a call will not be recorded. In essence, Plaintiff posits that the reasonableness of a party's expectation concerning eavesdropping is subject to a factual inquiry, but the reasonableness of an expectation concerning recording is not. Stated differently, Plaintiff contends liability is established merely by showing there was no notification the communication would be recorded, regardless of whether one could reasonably expect not to be recorded.

13

Contrary to Plaintiff's position, nothing in the language of section 632 or the case law interpreting "confidential communication" suggests that recording a conversation without advising the other party constitutes a per se violation of the statute. We acknowledge that, for purposes of the summary judgment motion in *CashCall*, "it was assumed that the calls were not recorded; [rather] the supervisor would listen to the call while the conversation was occurring." (*CashCall, supra*, 200 Cal.App.4th at p. 1385.) Be that as it may, we see no reason why the factors listed in *CashCall* would not apply equally where a business records telephone conversations with its customers. Nothing about those factors is peculiar to eavesdropping or incongruent with assessing the reasonableness of a plaintiff's alleged expectation that a call will not be recorded. Indeed, other courts that have addressed the issue have determined that reasonableness, even with respect to an expectation concerning recording, is a factual question for the jury to decide. (See, e.g., *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 926 [jury must decide "whether it was reasonable for plaintiff to expect, in the circumstances of his particular workplace, that an interaction between coworkers would not be subject to covert videotaping"]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 169 ["It is for the jury to decide whether under the circumstance presented [the plaintiff] could have *reasonably* expected that the communications were private" and, thus, would not be recorded].)

We agree with *CashCall*, and the trial court, that the determination whether an individual plaintiff had an objectively reasonable belief that his or her conversation with First American's Inside Sales group would not be recorded will require individualized proof of, among other things, "the length of the customer-business relationship [and] the [plaintiff's] prior experiences with business communications . . . ." (*CashCall, supra*, 200 Cal.App.4th at p. 1396.) Indeed, as the trial court alluded to at the class certification hearing, Plaintiff's unique circumstances—including the fact that she had made approximately a dozen calls to First American during which she was told that the call "may be monitored or recorded"—sets her apart, for purposes of assessing the reasonableness of her expectations, from other customers who never heard the disclosure

14

or heard it only a few times.  Likewise, Plaintiff's prior experience with other businesses—the "dozens and dozens and dozens" of telephone calls where she understood her call could be recorded or monitored for quality assurance—could support a jury finding that she lacked an objectively reasonable expectation that her calls with First American would not be recorded.  A jury could rationally reach a different conclusion concerning another plaintiff who has not had the same experience.  In any event, due process requires that First American be permitted to cross-examine an individual plaintiff regarding those experiences that may impact the reasonableness of his or her alleged confidentiality expectation.

The trial court's conclusion also is supported by the declaration offered by First American's marketing expert, Ms. Golden.  Ms. Golden's survey results showed that customers have divergent privacy expectations based on their unique backgrounds and experiences, including, in particular, whether they were previously advised by a company that an inbound call may be monitored or recorded.  (See *Sav-on, supra,* 34 Cal.4th at p. 333 [noting general relevance of "statistical evidence, sampling evidence [and] expert testimony" in class action cases].)

Substantial evidence supports the trial court's conclusion that assessing the objective reasonableness of an individual plaintiff's expectation of confidentiality will require individualized proof of the plaintiff's prior experiences with First American and other business communications.  (See *CashCall, supra,* 200 Cal.App.4th at p. 1396.)

4.    *Amending the Complaint to Add a Claim for Violation of Section 632.7 Will Not Ameliorate the Need for Individualized Proof*

In her reply brief, Plaintiff contends that the need to engage in an individualized factual inquiry could have been eliminated by permitting her to amend the complaint to add a claim for violation of section 632.7.  Because section 632.7 applies to cellular and cordless telephone calls and has no "confidential communication" requirement, Plaintiff argues granting leave to amend would have addressed the trial court's concerns regarding both the type of phone used and the need to individually assess the reasonableness of

15

each class member's expectation of confidentiality.  Plaintiff maintains the trial court abused its discretion by refusing to grant leave to amend.  We disagree.

To begin, as we noted in our discussion of the trial court proceedings, Plaintiff did not file a formal motion to amend, nor did she make the evidentiary showing required by rule 3.1324 of the California Rules of Court.  Moreover, when the trial court expressed concern that due process required that First American have an opportunity to respond to a written motion, Plaintiff conceded the point and agreed to "make a formal motion" asking "the court to amend the complaint to include a [section] 632 claim . . . ."  We find no abuse of discretion in the trial court requiring Plaintiff to bring a motion, compliant with the Rules of Court, to which First American would have an opportunity to respond—particularly in light of Plaintiff's express agreement to do so.

Apart from this, we also conclude that adding a section 632.7 claim would not have dispensed with the need to engage in an individualized factual inquiry.  The trial court found that Plaintiff's proposed methodology for identifying outbound calls provided no means to determine whether a landline, cellular or cordless telephone had been used to receive the subject call and that a call-by-call inquiry would be required to make this determination.  Even if a section 632.7 claim were added, this would not eliminate the need to determine what type of telephone was used, because the elements of a section 632 claim differ from those of a section 632.7 claim.  In particular, to determine whether an individual plaintiff will be required to establish that the subject call was a "confidential communication"—as required by section 632 for landline communications, but not by section 632.7 for cellular or cordless telephone communications—the trier of fact must first determine what type of telephone was used to receive the subject call.[4]

---

[4]     As the *Flanagan* court explained, in deciding not to include a "confidential communication" requirement in section 632.7, "the Legislature found that 'the advent of widespread use of cellular radio telephone technology means that persons will be conversing over a network which cannot guarantee privacy in the same way that it is guaranteed over landline systems.' " (*Flanagan, supra,* 27 Cal.4th at pp. 775-776.) Thus, while together sections 632 and 632.7, "protect[ ] against intentional, nonconsensual recording of telephone conversations regardless of the content of the

That determination, as the trial court found, will require an individualized call-by-call inquiry.

Because the trial court did not commit legal error in concluding common questions of fact do not predominate, we need not consider the other grounds the court identified for denying class certification. (*Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 512, fn. 14.)

## DISPOSITION

The order is affirmed.  First American is entitled to its costs on appeal.

**CERTIFIED FOR PUBLICATION**

KITCHING, J.

We concur:

KLEIN, P.J.

ALDRICH, J.

---

conversation or the type of telephone involved" (*id.* at p. 776), for landline communications, section 632 imposes the added requirement that the plaintiff establish "an objectively reasonable expectation that the conversation is not being overheard or recorded." (*Id.* at p. 777.)

17

# EXHIBIT "AA"

# In The Matter Of:

## LAURA McCABE and LATROYA SIMPSON
### v.
## SIX CONTINENTS HOTELS, INC.

---

## SNYDER, RANDALL A. - Vol. 1
### July 23, 2014

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

Exhibit AA

RANDALL A. SNYDER - 7/23/2014

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LAURA McCABE and LATROYA          )
SIMPSON, individually and on      )
behalf of a class of              )
similarly situated                )
individuals,                      )   Case No.
                                  )
        Plaintiffs,               )   3:12-cv-04818-NC
                                  )
          VS.                     )
                                  )
SIX CONTINENTS HOTELS, INC;       )
and DOES 2 through 10,            )
inclusive,                        )
                                  )   Pages 1 - 121
        Defendants.               )
                                  )



DEPOSITION OF RANDALL A. SNYDER

WEDNESDAY, JULY 23, 2014

9:26 A.M.







Reported by:  JANET C. TRIMMER, RPR, CRR,

CA CSR No. 4008, NV CCR No. 864

RANDALL A. SNYDER - 7/23/2014

```
 1              Deposition of RANDALL A. SNYDER, the

 2   WITNESS, taken on behalf of the DEFENDANT, at

 3   400 South Seventh Street, Third Floor, Las Vegas,

 4   Nevada, on Wednesday, July 23, 2014, at 9:26 a.m.,

 5   before Janet C. Trimmer, RPR, CRR, California

 6   CSR No. 4008, Nevada CCR No. 864.

 7

 8   APPEARANCES:

 9

     FOR PLAINTIFFS:
10
             KELLER GROVER, LLP
11           BY:  ERIC A. GROVER, ESQ.
             1965 Market Street
12           San Francisco, California 94103
             (415) 543-1305
13           eagrover@kellergrover.com

14           -and-

15           LAW OFFICES OF SCOT D. BERNSTEIN
             A Professional Corporation
16           BY:  SCOT BERNSTEIN, ESQ.
             101 Parkshore Drive
17           Suite 100
             Folsom, California 95630
18           (916) 447-0100
             swampadero@sbernsteinlaw.com
19

20   FOR DEFENDANT:

21           DLA PIPER
             BY:  EDWARD D. TOTINO, ESQ.
22           2000 Avenue of the Stars
             Suite 400 North Tower
23           Los Angeles, California 90067-4704
             (310) 595-3025
24           edward.totino@dlapiper.com

25
```

RANDALL A. SNYDER - 7/23/2014

Page 6

```
 1                   "Based on my education, knowledge,
 2           experience, expertise and training, it is my
 3           expert opinion that the proposed class [sic]
 4           members of the class in this case can be
 5           definitively and clearly ascertained based
 6           solely on their cellular telephone numbers."
 7           Do you see that?
 8      A.   Yes.
 9      Q.   What is the proposed class in this case?
10      A.   I just understand that it is a class action
11   lawsuit, and I was asked to opine on the ability to
12   identify individuals by a cell phone number that are
13   potentially members of the class, I assume, if it gets
14   to that point in the case.
15      Q.   Okay.  Just so we're clear, as you sit here,
16   do you know what the actual proposed class is in this
17   case, the definition?
18      A.   No.
19      Q.   So when you say in paragraph 26 that the
20   "proposed members of the class can be definitively and
21   clearly ascertained based solely on their cellular
22   telephone numbers," how can you make that conclusion
23   if you don't know what the class definition is?
24      A.   I was told by plaintiffs' counsel that the
25   proposed members of the class were those people with
```

RANDALL A. SNYDER - 7/23/2014

```
 1        Q.  So there's two steps you mentioned so far:
 2   The one identifying the telephone number as a cellular
 3   telephone or a landline, and the second step is going
 4   to either the cellular carriers or the databases you
 5   mentioned to figure out who was the subscriber or
 6   maybe possibly the user.  Anything you would do to
 7   ascertain the class in this case?
 8        A.  Well, I'm not -- again, I'm not an expert in
 9   class action law.  I understand that there's
10   administrative procedures, and I've even received
11   notification in the mail for suits where I may be a
12   class member that I didn't even know was going on
13   where you are supposed to either sign something or
14   have a notary notarize a sworn affidavit or provide
15   some data.  So I understand that that's another
16   mechanism potentially.
17        Q.  You are not an expert in that; right?
18        A.  Not at all.
19        Q.  Anything else that you would do to ascertain
20   the class in this case?
21        A.  Nothing besides getting the proper status of
22   the number on a date and cross-correlating it with
23   other publicly available information databases, no.
24        Q.  To find the subscriber or the user; correct?
25        A.  Well, again, we're trying to find the
```

RANDALL A. SNYDER - 7/23/2014

 1      Q.   You have never tried to determine the

 2   residency of someone, personally; right?

 3      A.   No.

 4      Q.   And it may very well be that someone has a

 5   billing address in California but actually has a

 6   residency in Nevada because they don't want to pay

 7   income tax or something; right?

 8      A.   Yeah, that's possible.

 9      Q.   Then -- so let me ask you this:

10           Can you determine whether a person is a

11   California resident based solely on his or her

12   cellular telephone number?

13      A.   It's not that absolute.  You may or may not

14   be able to tell.

15      Q.   Okay.  Then another factor in here that we

16   went through was they made the call while located in

17   California.  Do you see that, in this part (a)?

18      A.   Yes.

19      Q.   Okay.  So we have to figure out to ascertain

20   the class whether they made the call while located in

21   California.  Can you determine that solely based on

22   his or her cellular telephone number?

23      A.   Most likely, yes.

24      Q.   How would you go about doing that?

25      A.   Depending on the carriers that were serving

RANDALL A. SNYDER - 7/23/2014

1      Q.  But you have never actually -- it's never

2   been your job to figure out where someone was when

3   they made a call; correct?

4      A.  It was never an assigned job to me, no.

5      Q.  And as far as this timing error that you were

6   talking about that they asked you about, what was your

7   conclusion on that event?

8      A.  My expert opinion in cases like that is that

9   the infrastructure equipment in the networks are very

10  reliable and very accurate.

11         If somebody says, a person says they were ten

12  miles away from where their phone was located at a

13  given time, my opinion would be at most the timing of

14  the system may be a couple of seconds and probably not

15  even that difference in time, as opposed to what I was

16  asked to do by these attorneys, was potentially see if

17  there's several minutes they could be off by, which I

18  don't believe is true at all.

19     Q.  Is it possible that for some reason or

20  another their cell phone was picked up at a further

21  tower or site?

22         MR. GROVER:  Objection.  Vague and ambiguous.

23         THE WITNESS:  In some cases the way the

24  signaling works in the network, let's say to place or

25  deliver a call, there's something called border cell

RANDALL A. SNYDER - 7/23/2014

1    was routed to one of the defendant's English-speaking

2    call centers.  Do you see that?

3        A.  Yes.

4        Q.  Can you determine whether a person's call was

5    routed to one of the defendant's English-speaking call

6    centers based solely on his or her cellular telephone

7    number?

8            MR. GROVER:  I'm going to object to the

9    extent it's an incomplete hypothetical.  We know that

10   defendants on record show that --

11           MR. TOTINO:  If you could avoid the speaking

12   objections, Mr. Grover.  As to form, please.

13       Q.  Go ahead.

14       A.  I'm not 100-percent sure, but how I would do

15   it to be sure and if the data was available, was

16   certainly determining from call detail records whether

17   a cellular telephone number actually called one of

18   these toll-free numbers, and then I assume you would

19   have to have defendants produce information about what

20   call center those toll-free numbers are associated

21   with.

22           If there is one or more, I understand it --

23   in some instances a call can be routed to one or, if

24   it's busy, routed to another potentially, so...

25       Q.  But you haven't done that in this case at

RANDALL A. SNYDER - 7/23/2014

```
 1   all?

 2        A.  I have not done that in this case.

 3        Q.  And you don't know what data the defendants

 4   have, as far as that goes; right?

 5        A.  No.

 6        Q.  And even if the defendant had data, that

 7   would be only if they captured the telephone number of

 8   the person that called in; right?

 9        A.  Well, yes.

10        Q.  Okay.  And some people have blocked numbers,

11   for instance, where you can't capture it; right?

12            MR. GROVER:  Objection.  Incomplete

13   hypothetical.  You'll have to be specific perhaps as

14   to the system that they have, whether or not the

15   numbers are blocked or unblocked through the system

16   you are using.

17            MR. TOTINO:  I'll restate the question.

18        Q.  Do some people have blocked telephone

19   numbers?

20        A.  By "blocked" I assume you mean they've taken

21   an affirmative step to turn off caller ID from their

22   respective --

23        Q.  Yes.

24        A.  Yes, some people have turned off caller ID.

25        Q.  Do you have any idea what percentage of
```

RANDALL A. SNYDER - 7/23/2014

1    other toll-free numbers in a database.  They could be

2    subpoenaed to provide the real telephone number that

3    represents the terminating party, and then based on

4    that number, if it's a landline, you can determine

5    exactly where, what location that number is located

6    at.

7         Q.  If it's a landline?

8         A.  If it's a landline.

9         Q.  What if it's a voice-over-IP system?

10        A.  Yes.

11        Q.  You can determine where the person actually

12   answered the call?

13        A.  Yes.  They have an IP address.

14        Q.  If the call -- are you familiar with how

15   companies use voice-over-IP systems to distribute

16   telephone calls throughout their various call centers

17   or not?

18        MR. GROVER:  Objection.  This witness has not

19   been asked to testify as an expert in that area.

20        THE WITNESS:  Yeah, I will say I'm not an

21   expert in voice-over-IP services.  I know something

22   about them, but I'm not an expert.

23   BY MR. TOTINO:

24        Q.  Let's go back to this class definition of

25   (a), the cellular telephone class.  Towards the end of

1    that definition there is a factor, it says "were

2    recorded by defendant."  Do you see that?

3        A.  Yes.

4        Q.  Can you determine whether a person's call was

5    recorded by a defendant based solely on his or her

6    cellular telephone number?

7        A.  No.

8        Q.  And then the next one says "without notice."

9    Do you see that?

10       A.  Yes.

11       Q.  Okay.  I presume that's notice that calls may

12   be recorded, because that's what we are here about

13   today.

14           Can you determine whether or not a person was

15   provided with notice that calls may be recorded based

16   solely on his or her cellular telephone number?

17       A.  No.

18       Q.  Now, let's take a look at subclass (b) there.

19   Do you see that in front of you --

20       A.  Yes.

21       Q.  -- on this Exhibit 2?  I'll read it for the

22   record.  It says:

23               "All California residents who, at any

24           time from March 1st, 2011, through and

25           including July 17, 2012, used a cordless

```
 1            THE WITNESS:  It appears that each paragraph
 2    is a copy of the other except for a couple of terms.
 3    BY MR. TOTINO:
 4        Q.  Are the couple of terms "used a cordless
 5    telephone"?
 6        A.  It appears that way at just a casual glance
 7    right now.
 8        Q.  Let me ask you this:  Can you determine
 9    whether a person used a cordless telephone based
10    solely on his or her cellular telephone number?
11            MR. GROVER:  Objection.  Vague and ambiguous.
12            THE WITNESS:  That doesn't make sense to me.
13    BY MR. TOTINO:
14        Q.  Because if you are using a cellular
15    telephone, you are not using a cordless telephone --
16        A.  Yes, cordless technology is quite different
17    from cellular technology.
18        Q.  Can you tell whether a person used a cordless
19    telephone based on the telephone number at all?
20        A.  I don't know.  I was asked to opine on
21    landline versus cellular issues.  I don't know if
22    there is a mechanism to determine if you can tell what
23    kind of handset was used on a landline phone.
24        Q.  Have you ever heard of anything like that?
25        A.  No.
```

RANDALL A. SNYDER - 7/23/2014

1      Q.  And you are not an expert in that area;

2   right?  Determining whether someone used a cordless

3   telephone or not?

4      A.  That's correct.

5      Q.  Who drafted this declaration that you signed?

6      A.  I did.

7      Q.  Did you have any assistance?

8      A.  No.

9      Q.  If we go back to page 13 of Exhibit 1,

10   paragraph 26, again it says:

11          "Based on my education, knowledge,

12          experience, expertise and training, it is my

13          expert opinion that the proposed members of

14          the class in this case can be definitively

15          and clearly ascertained based solely on their

16          cellular telephone numbers."

17      Do you see that?

18      A.  Yes.

19      Q.  Now that you have seen the class definitions

20   in Exhibit 2, the cellular class and the cordless

21   class, do you believe that's a true statement still?

22      A.  Well, that's out of context.  Paragraph 26 is

23   certainly based on a summary of everything illuminated

24   and described in previous pages.

25          I never made a statement that every single

RANDALL A. SNYDER - 7/23/2014

Page 46

1   legislation relevant to this case?

2       A.  No.

3       Q.  Have you testified before any legislative

4   body that has considered legislation or regulations

5   relevant to this case?

6       A.  No.

7       Q.  What areas do you consider yourself an expert

8   in?

9       A.  It's hard to say.  Generally I would say I'm

10  an expert in all areas of signaling networking in the

11  core network used for cellular technology.

12          An area where I'm not an expert in is the

13  radio interface.  That's the radio technology,

14  essentially, between a handset and the antenna at the

15  base station.  So I never was involved in RF

16  engineering or any of that stuff.

17          But anything from the antenna back to

18  services, features, standards, protocols, and

19  individual network elements, the switching systems,

20  ancillary elements, and basically how the overall

21  system works down to a pretty fair level of detail, I

22  would say I'm an expert in.

23      Q.  And all of it is cellular networks?

24      A.  Some with landline.  Landline's actually much

25  simpler than cellular.  So yes, they use some of the

RANDALL A. SNYDER - 7/23/2014

1    same signaling protocols in landline, but it's much

2    more straightforward.

3        Q.  And this expertise is based on the work

4    experience that you have gained after graduating from

5    university with a math and astronomy degree?

6        A.  Yes.

7        Q.  And how many years of experience was it?

8        A.  Thirty now.

9        Q.  Do you have any experience with telephone

10   recording systems?

11       A.  A little.

12       Q.  So you don't consider yourself an expert with

13   telephone recording systems; right?

14       A.  No, but I would consider myself an expert in

15   how voice mail systems work, for instance, which is

16   one means of recording, and I've done quite a bit of

17   work with interactive voice response systems.

18           But I'm not an expert in the actual

19   implementation and the process of recording calls when

20   someone is on the other line.

21       Q.  Have you ever worked with -- have you ever

22   heard of a company called Nice, n-i-c-e?

23       A.  Yes.

24       Q.  Have you had any experience with that system

25   at all?

RANDALL A. SNYDER - 7/23/2014

1       A.  No.

2       Q.  Have you ever heard of a company called

3    Verint, V-e-r-i-n-t?

4       A.  I have.

5       Q.  Any experience with that system at all?

6       A.  No.

7       Q.  Have you ever published any articles on

8    distinguishing cellular telephone numbers from

9    landline telephone numbers?

10      A.  I may have.  I'm not sure.  I'd have to look.

11   We used to do some -- I was involved in running some

12   information for some newsletters in the cellular

13   industry back in the nineties when numbering was a big

14   issue, especially because of GSM, where you had to

15   include the country code in the number that was in the

16   signaling network.

17          So I'm sure I had addressed that at some

18   point in the past.

19      Q.  But as you sit here, you don't remember any

20   particular article that you wrote?

21      A.  No.  I wrote an article about inner-working

22   between the two types of networks, and that was

23   certainly an issue on the numbering plan.

24      Q.  What was the title of that; do you remember?

25      A.  I think it was -- we actually have a chapter

RANDALL A. SNYDER - 7/23/2014

```
 1          MR. GROVER:  Just to clarify, I'm not
 2  involved in the case but my firm is.
 3          MR. TOTINO:  Okay.
 4          MR. GROVER:  But it's not the same thing that
 5  I'm involved in.
 6  BY MR. TOTINO:
 7      Q.  And that's a TCPA case?
 8      A.  Yes.
 9          MR. BERNSTEIN:  For clarity, in case it's not
10  already clear, I'm not involved in that one either.
11  BY MR. TOTINO:
12      Q.  So the law firm Kelly Grover is involved in
13  Nunez vs. Twitter?
14      A.  Yeah, and I just found that out last night.
15      Q.  They were the ones who retained you, or
16  some one else?
17      A.  No, I was retained by a law firm out of
18  Chicago.
19      Q.  Is it fair to say that most of your opinions
20  are in TCPA cases?
21      A.  Yes.
22      Q.  And I think you mentioned already this is the
23  only telephone recording case you are involved in;
24  right?
25      A.  Yes.
```

```
 1      Q.  So you haven't been involved in any other
 2  California Privacy Act cases except the Penal Code
 3  section you mentioned, Section 632 or 632.7?
 4      A.  That's correct.
 5      Q.  In any of the previous cases you are involved
 6  in other than the criminal ones that you were asked
 7  about, those two, did you ever have to determine
 8  caller location?
 9      A.  I don't think so.
10      Q.  When were you first contacted on this case?
11      A.  Earlier this year.  I don't know the exact
12  month.
13      Q.  And who contacted you?
14      A.  I think Eric Grover did.
15      Q.  Mr. Grover, who is sitting next to you right
16  now?
17      A.  Yes.
18      Q.  And what did he tell you about the case?
19      A.  He described it to me a little.  I said I'm
20  not really familiar with the law, California state
21  law, of course.  And he basically asked me if I knew
22  about telephone numbering, and we discussed basically
23  the issues that he wanted me to potentially opine
24  about.  And I said, yeah, sure, I have lots of
25  testimony in that area in other cases.
```

RANDALL A. SNYDER - 7/23/2014

```
 1      A.  Almost all.

 2      Q.  Almost all litigation?

 3      A.  Almost all, yeah.

 4      Q.  Do you consider yourself a professional

 5  litigation consultant?

 6      A.  In a sense.  I still -- I still do a lot with

 7  current technology.  I'm on the advisory board of a

 8  couple of companies.  I still work with a couple of my

 9  previous start-ups.

10          But, yeah, I'm kind of a professional expert

11  witness, I'd say, at this point.

12      Q.  Okay.  And do you have a file on this case?

13      A.  On this case?

14      Q.  Yes.

15      A.  I have an electronic file that basically just

16  has all the documents we have here.

17      Q.  Okay.  Just the stuff that was listed in your

18  report?

19      A.  Stuff listed in my report and, you know, my

20  declaration in Word form and PDF form, and the

21  exhibits.

22      Q.  I guess your invoices maybe.

23      A.  Invoices, retainer agreement.

24      Q.  Was your payment in this case contingent on

25  your opinions reached?
```

1           MR. GROVER:  Paragraph 18 is on 10, if you

2    want paragraph 18.

3    BY MR. TOTINO:

4       Q.  Okay.  Let's look on page 10, paragraph 18.

5    Now, if you look at the last paragraph of that -- last

6    sentence of that paragraph 18 on page 10 of Exhibit 1,

7    it says:

8               "CDRs" -- which are call detail

9           records -- "including this data, and

10          potentially additional data if requested, can

11          be obtained and produced by wireless carriers

12          via subpoena using only the cellular

13          telephone number as the unique identifying

14          piece of data that will serve as the

15          information for a detailed call record

16          search."

17           Do you see that?

18      A.  Yes.

19      Q.  Okay.  Have you ever yourself subpoenaed

20    records like that?

21      A.  Not personally, but I've been on many cases

22    where I worked with the attorneys and they ran the

23    subpoena by me that they were providing to say if they

24    were asking for the right stuff, and then they did and

25    we received the record.  So I haven't done it

RANDALL A. SNYDER - 7/23/2014

1    personally, but I've been closely involved in that

2    process.

3        Q.  Okay.  And how many phone numbers were in

4    those subpoenas?

5        A.  Oh, some of them, there were many, many, you

6    know.  Some there was few; some there were many.

7        Q.  How many times have you been involved in that

8    process?

9        A.  Ten maybe.

10       Q.  What kind of cases were these?

11       A.  TCPA cases.

12       Q.  And were they class actions, or not?

13       A.  Almost -- I've done -- I've been an expert on

14   a couple of cases that were not class actions that

15   were TCPA, but for the most part they were, I would

16   say yes.

17       Q.  What carriers were involved in those

18   subpoenas?

19       A.  All of them.  Generally the top four, AT&T

20   Mobility, Verizon, Sprint, and T-Mobile.  However,

21   I've been involved in sending subpoenas to what's

22   considered the Tier 2 carriers, U.S. Cellular -- there

23   has been a lot of consolidation.  For instance, AT&T

24   bought Leap, which owns Cricket, is their prepaid

25   service, that kind of thing.

RANDALL A. SNYDER - 7/23/2014

1    received records that just had all kinds of extraneous

2    information we didn't need in the columns, and

3    sometimes that was there.

4         Q.  Do you know what cell carriers Ms. McCabe or

5    Ms. Simpson have?

6         A.  No.

7         Q.  If the call detail records are not available,

8    no longer available from the cell carrier, does that

9    mean the cell site information won't be available as

10   well?

11        A.  I'm not sure.  It may or may not be.  I'm not

12   sure.

13        Q.  Let's talk about switching system.  I think

14   you mentioned if you don't have the cell site

15   information, you still may know which switch that the

16   call went through.  Is that right?

17        A.  Yes.

18        Q.  And what is the switching system?

19        A.  The way cellular telephone communications

20   work is kind of, on a 50,000-foot view, is really a

21   spoke-and-hub system, where the switch is the hub and

22   all the cell sites subtend that switching system.

23            So some switching systems can support 200 --

24   theoretically 256 cell sites that have landlines

25   connecting them back, either overhead or underground,

RANDALL A. SNYDER - 7/23/2014

1      A.  Yes.

2      Q.  -- "thus, even when the cell site information

3  no longer is available, it is still possible to

4  determine whether a call originated from within

5  California."

6      A.  Yes.

7      Q.  So is the switching system always included in

8  the CDRs, or is it something you have to ask for

9  specifically?

10     A.  Usually you have to ask for it specifically.

11 The cell site information is a massive amount of

12 information, knowing -- because cell sites record even

13 when you are not on the call.  As you are going

14 through them, your phone registers with the system

15 again.

16         So, you know, you are on a busy highway that

17 has 100,000 cars in several hours.  It actually

18 records all that information on those phones, even if

19 a call wasn't made.  But there is so much extraneous

20 information, that's typically a very large amount of

21 information that isn't saved as long, and I guess

22 maybe the NSA might ask for that.

23         But the switching information is certainly

24 saved as long as the call detail information is saved.

25     Q.  So if the call detail records are no longer

RANDALL A. SNYDER - 7/23/2014

Page 74

1    available, the switching records won't be there

2    either?

3        A.   Generally, no.

4        Q.   Now, let's look at paragraph 20 of your

5    declaration, Exhibit 1 again.  You discuss exhibit B

6    to your declaration; right?

7        A.   Yes.

8        Q.   What is exhibit B?

9        A.   This was actually a leaked document.  There

10   is a more updated one I think I found from 2012.

11   After I did this report I was searching around the

12   last few weeks.

13           This is not supposed to be a public document,

14   but it was leaked by one of the wireless news

15   services.  And when I found this about two years ago,

16   this was a big revelation to a lot of people.

17   Everybody knew that these records were saved.

18           And these are general numbers for the

19   carriers, but there was no standard.  But somebody

20   leaked this from the department of justice and it

21   became a public document and it was all over the

22   wires.

23           So I pulled this out and I've used it.  I

24   think this is generally accurate and especially for

25   the time frame.  I -- and like I said in my report,

RANDALL A. SNYDER - 7/23/2014

1    I've no reason to believe why this is still not

2    accurate today even though this is a three-year-old

3    document.

4        Q.  You said you found a more recent one, though?

5        A.  I think I saw one that said 2012, and I'm not

6    sure.  And the way I did that was I basically took

7    this title "Retention Periods of Major Cellular

8    Service Providers" and just plugged that into Google

9    with quotes around it.

10       Q.  You did not bring it with you, though?

11       A.  I did not.

12       Q.  You said this was leaked by the federal

13   government somehow?

14       A.  Somehow it was leaked.  And I subscribe to a

15   whole bunch of wireless news services that I read

16   every day to keep up with things.  And there was one

17   day a couple of years ago where this -- it says -- oh,

18   "cellular service provider retention periods" and you

19   click on it and it was an article, and they would say,

20   well, this was leaked out onto the Web and they have

21   this as a downloadable PDF.

22       Q.  Okay.

23       A.  So I don't think this was originally intended

24   for public dissemination but it was disseminated

25   publicly.

RANDALL A. SNYDER - 7/23/2014

1       Q.  Okay.  And you think it's reliable?

2       A.  I do.

3       Q.  But you haven't tested it; right?

4       A.  I haven't actually tested each one of these

5   for each of these carriers, but I've heard nothing to

6   the contrary from information I've gotten back on TCPA

7   cases about notification and things like that.

8       Q.  Okay.  So taking a look at exhibit B to your

9   declaration, so let's look first for Verizon.  It's

10  the first column.  First of all, is Verizon the

11  largest carrier in the U.S.?

12      A.  It depends what you mean by "largest."  Most

13  subscribers?

14      Q.  Yes.

15      A.  They're usually battling back and forth

16  between AT&T Mobility.  I think Verizon might have

17  1 million or 2 million more right now, but they are

18  well over 100 million each.

19      Q.  And what percentage of the market is that; do

20  you know?

21      A.  It's probably about 30 percent.

22      Q.  So AT&T would have 30 percent or so and

23  Verizon would have 30 percent or so and the other 40

24  percent is split up among the other companies?

25      A.  Yeah, I think there's something like 330

RANDALL A. SNYDER - 7/23/2014

```
 1      Q.  And the same thing with the call detail
 2  records, you don't really know how far they go back
 3  or --
 4      A.  That's right.  You know, I look at this as a
 5  general indication.
 6      Q.  Okay.  You are not an expert on this
 7  retention period of cell phone carriers; right?
 8      A.  No, I'm not.
 9      Q.  So if we took exhibit B as accurate, the only
10  company that would have call detail records that are
11  more than two years old would be AT&T and T-Mobile for
12  the prepaid, right, or postpaid?
13      A.  That may be.
14      Q.  Okay.  So those are the only ones that would
15  have records relevant to the class period, right,
16  because the class period is more than two years old at
17  this point?
18      A.  That may be true.
19      Q.  And with respect to the cell towers used by
20  the phones for calls, looks like only AT&T -- if this
21  exhibit B is accurate, only AT&T would have records
22  relevant to the class period; right?
23      A.  That may be true as well.  But, of course, I
24  do think you have to request it to know for sure.
25      Q.  Do you know whether this information was ever
```

RANDALL A. SNYDER - 7/23/2014

1    information is available as you say here; right?

2        A.  No.  I'm just saying the information exists.

3    You know, if you ask me, say, 20 years from now, I

4    could easily say, well, I don't know; it might not.  I

5    just don't know.

6        Q.  I think what you are saying is the

7    information existed at one point; you just don't know

8    whether it is still there or not?

9        A.  You are exactly right.

10       Q.  And you haven't gone to each carrier and

11   checked?

12       A.  That's correct.

13       Q.  Okay.  Were you asked to do that?

14       A.  No.

15       Q.  And if exhibit B to your declaration is to be

16   believed, a lot of the information may very well not

17   be there; right?

18       A.  If -- if that exhibit, which I received,

19   obviously, from a third party, that was made publicly

20   available, is truly 100 percent accurate in every way,

21   yes, I would say that a lot of that information would

22   not be available, but I don't know that hypothetical

23   for sure.

24       Q.  Now, I think I asked you a question about

25   cordless telephones before.  You are not aware of any

RANDALL A. SNYDER - 7/23/2014

 1    way to determine whether someone was using a cordless

 2    telephone to make a call; right?

 3        A.  That's correct.  I wasn't asked to provide an

 4    opinion on that.

 5        Q.  Okay.  I think you mentioned you don't have

 6    much experience with voice-over-Internet protocol?

 7        A.  That's correct.

 8        Q.  So you don't know anything about Magic Jack

 9    or Skype?

10        A.  No, I generally understand how they work and

11    how Vonage works, but I wouldn't say I have a depth of

12    technology expertise as I do on traditional cellular

13    and landline networks.

14        Q.  Okay.  Do you know, with the

15    voice-over-Internet protocol technology someone could

16    be located, for instance, in New York and have a

17    California area code?  Is that right?

18        A.  Yes, but there are certainly issues with IP

19    addresses that, depending on how the operators use

20    them and how the calls are routed through the network,

21    they may not be truly representative of location.

22    Generally IP addresses are geolocation-based.

23        Q.  Okay.  But do you know if the carriers keep

24    the IP addresses when a person makes a call or not?

25        A.  For voice-over-IP, I don't know that.  The IP

RANDALL A. SNYDER - 7/23/2014

1      A.  Yes.

2      Q.  And this is all about the person who owns the

3   telephone number, is that right, or pays the bill?

4      A.  The registered user, typically the one that

5   has the account and pays the bill.

6      Q.  So if I have an account in my name but I get

7   an extra phone to give to my wife, it may not have her

8   information on it; right?

9      A.  It may or may not.  I have seen lots of

10   billing records in a lot of the cases where even

11   though there is a single payor and address, there's

12   actually a name associated with every number, and some

13   of the carriers actually require that now, so even on

14   a family plan you have to list the name.

15         But again, if those phone numbers were used

16   for any other public documentation, that might be

17   cross-referenced in a database.

18      Q.  In a database, you mentioned, yeah.

19         But as far as the carriers' subscriber

20   information, they don't all require you to have your

21   family members listed out; right?

22      A.  I don't know that for sure for each carrier.

23   I think AT&T Mobility did when I put my son on my

24   wife's plan.

25      Q.  Have you done any analyses or studies on the

RANDALL A. SNYDER - 7/23/2014

```
 1    variance between the account holders and the phone
 2    users?
 3         A.  No.
 4         Q.  Do you know what percentage of phone users
 5    are not account holders?
 6         A.  Could you clarify the question, please?
 7         Q.  Yeah.  I mean, there is a person listed with
 8    the carrier as the account holder who pays the bills
 9    and it's their address.  Do you know what percentage
10    of people who actually use the phones are not those
11    people that are listed with the carrier?
12         A.  What, you mean like if I lend my friend the
13    phone to make a call because his is out of battery
14    power or something?
15         Q.  No.  If you have a family plan, for instance,
16    you give a phone to your kid but you don't put their
17    name on the account; do you know what percentage that
18    is?
19         A.  I don't know offhand.  You might be able to
20    research it.
21         Q.  But you have never done that; right?
22         A.  I haven't done that.
23         Q.  And it's not just family members.  Some
24    people, if they have friends, will let friends have
25    accounts on their family plan; right?
```

RANDALL A. SNYDER - 7/23/2014

1      A.  Yeah, there's all kinds of hypothetical cases

2    like that, but in general, I would say my experience,

3    my personal experience has been and my experience in

4    the industry has been that those are all EDGE cases,

5    essentially.  It's certainly not the great bulk of

6    subscribers out there.

7      Q.  What percentage of cell phone accounts are

8    family plans; do you know?

9      A.  I think a pretty large percentage, but I

10   don't know if it's the majority.  So I don't know.

11     Q.  Have you ever done a study of that?

12     A.  No.

13     Q.  No analysis?

14     A.  No.

15     Q.  Do you know what percentage --

16         MR. GROVER:  Could I just interject?  You've

17   used "family plan" a couple of times.  There are

18   family plans with four numbers.  Are you talking about

19   there's multiple numbers in a plan?

20         MR. TOTINO:  Yes, for one account there's

21   multiple telephone numbers.

22         MR. GROVER:  Just wanted to be sure we were

23   on the same page.

24   BY MR. TOTINO:

25     Q.  Do you know what percentage of family plans

RANDALL A. SNYDER - 7/23/2014

1    that, but they actually access -- today A.B. Data

2    accesses one of the companies like CompliancePoint or

3    Contact Center Compliance.

4         But A.B. Data's business is in

5    cross-referencing or correlating data from dozens of

6    organizations to find out all kinds of historical

7    information.  They have partnerships with all the

8    credit organizations and LexisNexis and dozens of

9    other --

10        Q.  So A.B. Data is -- would have, potentially,

11   information about who the subscriber to a cell phone

12   is?

13        A.  Yeah.  In fact, they advertise their accuracy

14   and reliability.  I've been in cases where they have

15   testified to that.  I've been on the phone talking

16   with them, and they actually -- for several of the

17   cases I've been involved with actually managed the

18   class action after it was settled, the whole

19   administration of it.

20        Q.  What about -- do you know if Neustar has any

21   subscriber information or not?

22        A.  They do.  Neustar has lots of information.

23   Some of it is publicly available; some of it is not.

24   So they maintain a lot of information about the

25   carriers and cellular telephone numbers and porting

1    histories and those types of things.

2         But the most common and generally well-known

3    information they provide is basically the information

4    of every telephone number and what carrier it's

5    associated with at any given point in time.  Right?

6    Or if that information is not readily available, you

7    have to go to another company that saves this type of

8    data.

9         Q.  And what about, does CompliancePoint have

10   subscriber information, or is it more of the same

11   thing --

12        A.  They claim to.  I've seen their marketing

13   materials.  They claim to have address information for

14   telephone numbers.

15        Q.  Have you ever been involved with using

16   CompliancePoint for any address information or

17   telephone numbers?

18        A.  Not address information, no, but I've been

19   involved with contracting.

20        Q.  And what about Contact Center Compliance?

21   Have you been involved with getting address or name

22   information from them?

23        A.  Not specifically.  Only telephone number

24   information from them.

25        Q.  And Neustar, have you only gotten telephone

RANDALL A. SNYDER - 7/23/2014

1    information, number information from them, or also the

2    address information?

3        A.  Only telephone information.

4        Q.  And what about A.B. Data?

5        A.  A.B. Data is one of the leading companies

6    I've found and worked with a lot in the industry that

7    their business is obtaining, compiling, analyzing,

8    cross-referencing data from dozens and dozens and

9    dozens of sources going back about ten years.

10            And that's the kind of business they are in,

11   is tying the telecom data to other individual data.

12       Q.  And have you personally requested that kind

13   of information from them?

14       A.  I haven't, but I know attorneys that have,

15   but I haven't.

16       Q.  You haven't done it?

17       A.  No.

18       Q.  And you are not an expert in A.B. Data, are

19   you, on what --

20       A.  No.  I hundred percent understand how they

21   operate and how their process works, but I'm not an

22   employee there, I'm not an expert in all their

23   database management, no.

24       Q.  Do you know how much it costs to get data

25   from them?

RANDALL A. SNYDER - 7/23/2014

```
 1      A.  No.

 2      Q.  Do you know, if you provide a list of a

 3   million telephone numbers to A.B. Data, what

 4   percentage you would get name and address information

 5   back from them on?

 6      A.  (No response.)

 7      Q.  I don't want you to guess.  If you don't

 8   know, that's fine.

 9      A.  I don't know.  I'm sure it's a great majority

10   or else they probably wouldn't be in business.  That's

11   their business.

12      Q.  Okay.  And have you seen any studies or

13   analyses of that issue?

14      A.  No, and I haven't asked them personally that

15   either.

16      Q.  You haven't done your own study of that;

17   right?

18      A.  That's correct.

19      Q.  Now, do people sometimes have cell phone

20   numbers with area codes that don't match their state

21   of residence?

22      A.  Yes.

23      Q.  Do you know what percentage of people have

24   that?

25      A.  No.
```

RANDALL A. SNYDER - 7/23/2014

```
 1              I, the undersigned, an RPR, CRR, and
 2     Certified Shorthand Reporter of the States of Nevada
 3     and California, do hereby certify:
 4              That the foregoing proceedings were taken
 5     before me at the time and place herein set forth; that
 6     any witnesses in the foregoing proceedings, prior to
 7     testifying, were duly sworn; that a record of the
 8     proceedings was made by me using machine shorthand
 9     which was thereafter transcribed under my direction;
10     that the foregoing transcript is a true record of the
11     testimony given.
12              Further, that before completion of the
13     proceedings, review of the transcript was not
14     requested.
15              I further certify I am neither financially
16     interested in the action nor a relative or employee
17     of any attorney or party to this action.
18              IN WITNESS WHEREOF, I have this date
19     subscribed my name.
20     Dated:    07-24-2014
21
22
23                     _____
24                     JANET C. TRIMMER
                       CCR No. 864
25
```

# EXHIBIT "BB"

# In The Matter Of:

*LAURA MCCABE and LATROYA SIMPSON*
*v.*
*SIX CONTINENTS HOTELS, INC.*

---

*SIMONSON, Ph.D., ITAMAR – Vol. 1*
*July 24, 2014*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

Exhibit BB

ITAMAR SIMONSON, Ph.D. - 7/24/2014

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA MCCABE and LATROYA SIMPSON, individually and on behalf of a class of similarly situated individuals, ) ) ) ) ) | |
| Plaintiffs, ) ) | Case No. 3:12-cv-04818-NC |
| vs. ) ) | |
| SIX CONTINENTS HOTELS, INC.; and DOES 2 through 10, inclusive, ) ) ) ) | |
| Defendant. ) | |

DEPOSITION OF

ITAMAR SIMONSON, Ph.D.

Thursday, July 24, 2014
9:01 a.m. - 11:51 a.m.

701 Fifth Avenue, Suite 7000

Seattle, Washington

REPORTED BY:

J. GAYLE HAYS, RPR, CCR #1964

ITAMAR SIMONSON, Ph.D. - 7/24/2014

1   what the majority think or what 95 percent think, is there

2   any way to find out that individual expectation without

3   asking a person?

4         A.     That's what surveys are for, right?  So it

5   seems to me that, when you have a large class, there are

6   often many people there, perhaps millions.

7         And it's impractical -- probably impossible -- to

8   interview every single person there.  That's why in such

9   matters you often see surveys being conducted.

10        So it seems to me almost irrelevant, but again, I'm

11  not a legal expert to ask what happens if I find one person,

12  and I need to find if that one person is exactly of the same

13  opinion or has the same expectation?  I'm not sure what it

14  will tell us.

15        Q.     The question I want to be told is what that

16  person's expectations are.  It will tell us that, right?

17        If I ask them specifically, it will tell us what

18  that particular person's expectations are, correct?

19        A.     Maybe or maybe not.  Measuring expectations

20  is not as easy unless you do it properly.  And when you

21  bring someone to court and you start asking that person what

22  were your expectations, I'm not sure how reliable that

23  answer would be even with regard to that individual.

24        Q.     Well, let's say we didn't have a class

25  action.  We had the same case, but instead of a class

ITAMAR SIMONSON, Ph.D. - 7/24/2014

Page 64

```
 1    action, it's just ten individuals bringing it together,

 2    right?

 3            A.      Right.

 4            Q.      Take that hypothetical.

 5            And then we get to trial, and I want to find out

 6    what each of those ten people -- whether they expected their

 7    calls to be recorded when they placed their call to Six

 8    Continents to make a hotel reservation.

 9            The way I would do that is to put each of them on

10    the witness stand and ask them that question, correct?

11                   MR. GROVER:  Objection, that calls for a

12    trial strategy opinion, and he's not a designated expert in

13    that area.

14            A.      It's possible you'll do that, yes.

15            Q.      BY MR. TOTINO:  Is there any way to figure

16    out what their expectations are without asking them?

17                   MR. GROVER:  Objection, calls for a lawyer's

18    opinion on trial strategy.

19            A.      Depends what the issue is in this

20    hypothetical case.

21            Q.      BY MR. TOTINO:  The issue is whether, when

22    they call Six Continents to make a hotel reservation, they

23    expected that their calls would be recorded even though they

24    weren't told that they would be recorded.

25            A.      If you're just talking about ten people, you
```

ITAMAR SIMONSON, Ph.D. - 7/24/2014

Page 65

1    might as well ask each one of them, yes, perhaps, but it's a

2    matter of strategy, and it's a whole separate issue.

3           Q.    Now, going back to the term "may" in

4    Dr. Golden's question, have you done any analysis of whether

5    the term "your call may be recorded" is what's actually used

6    to inform people in the marketplace that calls could be

7    recorded?

8           A.    I know that it has been used.  I've heard it.

9           Q.    And a survey is supposed to present

10   participants with what naturally occurs in the marketplace,

11   right?

12          A.    Generally speaking, yes.

13          But as I explained -- and we already talked about

14   that -- the way this question was worded was completely

15   ambiguous, because it did not put the respondents in the

16   situation that describes what happens in the marketplace

17   when they are told that their calls may be recorded for

18   whatever purpose.

19          Q.    In fact, you wrote a chapter in a book called

20   "Trademark and Deceptive Advertising Surveys" that actually

21   says you're supposed to present participants with the actual

22   market conditions, right?

23          A.    I did say that.

24          Q.    And here the market condition is the person

25   is told your call may be recorded, right?

ITAMAR SIMONSON, Ph.D. - 7/24/2014

```
 1   C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON  )
                          ) SS.
 4   COUNTY OF KING       )

 5

 6

 7           I, the undersigned Washington Certified Court
     Reporter, pursuant to RCW 5.28.010, authorized to
     administer oaths and affirmations in and for the State of
 8   Washington, do hereby certify:

 9           That the foregoing proceedings were taken
     stenographically before me and reduced to a typed format
10   under my direction;

11           That I am not a relative or employee of any
     attorney or counsel or participant and that I am not
12   financially or otherwise interested in the action or the
     outcome herein;
13
             That the proceedings as transcribed are a
14   full, true and correct transcript of the proceedings;

15           That as a matter of firm policy, stenographic
     notes of this transcript will be destroyed three years
16   from the date appearing on this transcript, unless notice
     is received otherwise from any party or counsel hereto on
17   or before said date.

18           Dated July 28, 2014.

19

20

21                          _____
                            J. Gayle Hays, RPR, CCR#1964
22

23

24

25
```

Merrill Corporation - Los Angeles
800-826-0277                      www.merrillcorp.com/law